**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

ANCO STEEL COMPANY, INC.,
        Plaintiff,

        v.

JRC OPCO, LLC n/k/a INTEREBAR
FABRICATORS, LLC,
        Defendant.
_____

JRC OPCO, LLC n/k/a INTEREBAR
FABRICATORS, LLC,
        Counter-Plaintiff,

        v.

ANCO STEEL COMPANY, INC.,
        Counter-Defendant.
_____

JRC OPCO, LLC n/k/a INTEREBAR
FABRICATORS, LLC,
        Third-Party Plaintiff,

        v.

LOUIS PAULA and DOUGLAS R.
ANDERSON,
        Third-Party Defendants.

CAUSE NO.: 2:21-CV-285-TLS

**OPINION AND ORDER**

Plaintiff ANCO Steel Company, Inc. (ANCO Steel) leased a warehouse in Hammond,

Indiana, for a five-year term to end July 31, 2021, under a Master Lease with the Landlord that

included an option to extend for a second five-year term. The warehouse is divided into a North

Crane Bay and a South Crane Bay. ANCO Steel, as Sublessor, then subleased the South Crane

Bay to Metal Partners Rebar, LLC d/b/a Metal Partners International (Metal Partners), as

Sublessee, under a Sublease for a concurrent five-year term to end July 31, 2021. Subsequently,

Metal Partners filed for bankruptcy. In October 2020, JRC OPCO, LLC n/k/a InteRebar Fabricators, LLC (InteRebar) purchased Metal Partners' assets and assumed the Sublease. On January 12, 2021, ANCO Steel informed InteRebar that ANCO Steel would be taking over the South Crane Bay for its own business at the end of the Sublease term. On January 20, 2021, ANCO Steel then exercised its option to extend the Master Lease for the second five-year term. InteRebar did not pay rent to ANCO Steel under the Sublease for May, June, and July 2021.

ANCO Steel is suing InteRebar for breach of contract for the failure to pay rent and for property damage to the South Crane Bay. InteRebar has counterclaimed for breach of contract based on ANCO Steel failing to allow InteRebar to extend the Sublease for a second term. InteRebar also filed third-party claims against Douglas Anderson, the owner of ANCO Steel, and against Louis Paula, the former plant manager for InteRebar who became the general manager for ANCO Steel. This matter is before the Court on four interrelated motions for summary judgment on the parties' claims related to the Sublease and certain employment relationships.

## PROCEDURAL BACKGROUND

Plaintiff ANCO Steel filed its First Amended Complaint [ECF No. 2] on August 23, 2021, in the Lake County, Indiana, Circuit/Superior Court against Defendants Intermetal Rebar, LLC (Intermetal) and InteRebar. Count I was a claim against Intermetal, which the parties have since dismissed. ECF No. 23. The remaining Count II is a claim for breach of the Sublease against InteRebar, alleging failure to pay rent for May, June, and July 2021 in the amount of $74,670.00 and damage to the leased property in the amount of at least $52,000. On September 15, 2021, InteRebar removed the action to this Court. *See* Notice of Removal, ECF No. 1.

On September 22, 2021, InteRebar filed a Counterclaim [ECF No. 5], and on May 3, 2022, InteRebar filed an Amended Counterclaim and Third-Party Complaint [ECF No. 34].

Count I is a breach of contract claim, alleging that ANCO Steel breached the Sublease when it refused to extend the term of the Sublease for a second five-year period. Count II alleges a conversion claim against ANCO Steel for knowingly and intentionally exerting unauthorized control over InteRebar's equipment. Count III is a claim of tortious interference with contract, alleging that ANCO Steel induced Paula to breach his employment agreement with InteRebar. Count IV for tortious interference with business relationships and Count V for civil conspiracy are brought against both ANCO Steel and Paula. Counts VI and VII, brought against Paula, allege claims of breach of contract based on an employment agreement and breach of fiduciary duty, respectively. Count VIII alleges that Douglas R. Anderson breached a Limited Liability Company Interest Purchase Agreement related to the sale of his interest in Metal Partners.

On December 4, 2022, the parties filed the instant four motions for summary judgment. Anderson filed his Motion [ECF No. 57] on the breach of contract claim in Third-Party Complaint Count VIII. Paula filed his Motion [ECF No. 61] on all claims against him in Third-Party Complaint Counts IV–VII. ANCO Steel filed its Motion [ECF No. 65], seeking summary judgment on its own breach of contract claim against InteRebar in Count II as well as on all claims in Counterclaim Counts I–V. Finally, InteRebar filed its Motion [ECF No. 69], seeking partial summary judgment on its Counterclaim Count I against ANCO Steel for breach of contract and its Third-Party Complaint Count VIII against Anderson. All motions are fully briefed and ripe for ruling. This Court has subject matter jurisdiction based on diversity of citizenship. *See* ECF Nos. 2, 5, 34, 94, 95.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). The movant may discharge this burden by "either: (1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (citation omitted). In response, the non-movant "must make a sufficient showing on every element of [the non-movant's] case on which [the non-movant] bears the burden of proof; if [the non-movant] fails to do so, there is no issue for trial." *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 358 (7th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

With cross-motions for summary judgment, the Court must construe all facts in a light most favorable to the party against whom the motion under consideration is made. *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017). A court's role "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted).

## FACTUAL BACKGROUND

At all relevant times, Douglas R. Anderson has been the President and sole shareholder of ANCO Steel, which he incorporated in 1995. IR Ex. 23, 6:10–17, 11:1–5.[1] In 2008, Anderson started Metal Partners to sell rebar. ANCO Ex. 3, 18:21–19:3. From its formation until Anderson's sale of his membership interest in December 2016 to Frank Bergren, Anderson owned and managed Metal Partners. IR Ex. E, 18:13–22, 19:16–17, 25:23–26:2.

---

[1] InteRebar's numbered exhibits are filed at docket entry 79 and lettered exhibits are filed at docket entry 70. ANCO Steel's exhibits are filed at docket entry 68.

A.      **The Master Lease**

In June 2016, ANCO Steel, as Tenant, entered into an agreement (Master Lease) with Hammond 4531 Columbia LLC (Landlord) under which ANCO Steel agreed to lease 126,422 square feet of an industrial building located at 4531 Columbia Avenue in Hammond, Indiana. ANCO Ex. 4. The "Property" is the real property and buildings located at that address, and the "Premises" is the "126,422 square feet of office/warehouse/industrial space located within the Property." *Id.* ¶ 1. Anderson signed the Master Lease on behalf of ANCO Steel. *Id.* p. S-1.

At all relevant times, the 126,422 square feet of real property was divided into a North Crane Bay and a South Crane Bay. IR Ex. 23, 26:17–27:10. At the time the Master Lease was negotiated, ANCO Steel intended to occupy the North Crane Bay and to lease the South Crane Bay to Metal Partners. *Id.* 27:11–24. At that time, ANCO Steel and Metal Partners were both owned by Doug Anderson. *Id.* 6:10–17, 11:1–5, 33:17–21.

Under Paragraph 2 of the Master Lease, the "Term" of the Master Lease was "five (5) years beginning on the Commencement Date . . . unless extended or sooner terminated pursuant to the terms of this Lease." ANCO Ex. 4, ¶ 2.1. The "Commencement Date" was "the earlier of (i) August 1, 2016, or (ii) the date that Tenant . . . occupies all or any part of Premises." *Id.* ¶ 2.2(A). Paragraph 3 provides the monthly rent schedule, *id.* ¶ 3, and Paragraph 22 provides that a failure to pay rent is a breach of the Master Lease, *id.* ¶ 22. The rights and remedies of the Landlord in the event of a breach are listed. *Id.*

Paragraph 34 of the Master Lease titled "Options to Extend" included one option for ANCO Steel to extend the Master Lease for one, additional five-year term:

> Landlord hereby grants to Tenant one (1) option to extend ("Option to Extend") the Term for the Premises for an additional five (5) years ("Option Term"), upon each and all of the terms and conditions of this Lease as amended below; provided, however, Tenant is not in default of this Lease on the date of

exercise of the Option to Extend and has not been in default of this Lease more than two (2) times during the Term, as extended. Tenant shall give to Landlord written notice on or prior to six (6) months before expiration of the then current Term of the exercise of the Option to Extend, time being of the essence. The Term, as defined in <u>Paragraph 2</u> hereof, shall also include the Option to Extend properly exercised hereunder.

*Id.* ¶ 34. Paragraph 34 then sets forth the base rent schedule for the Option Term and concludes: "The Option to Extend is personal to Tenant and may not be assigned without Landlord's written consent which may be withheld in its sole discretion." *Id.*

Paragraph 29 of the Master Lease addresses "Assignment and Subletting." Paragraph 29.1 provides:

No Assignment. Tenant shall not directly or indirectly, voluntarily or by operation of law, sell, assign, encumber, pledge or otherwise transfer or hypothecate all or any part of the Premises or Tenant's leasehold estate hereunder (collectively, "Assignment"), or permit the Premises to be occupied by anyone other than Tenant or sublet the Premises (collectively, "Sublease") or any portion thereof without Landlord's prior written consent in each instance, which consent may not be unreasonably withheld by Landlord.

*Id.* ¶ 29.1. Paragraph 29.2, titled "No Relief of Obligations," provides in relevant part: "The consent by Landlord to any Assignment or Sublease shall not relieve Tenant of the obligation to obtain Landlord's *express written consent* to any other Assignment or Sublease." *Id.* ¶ 29.2 (emphasis added).

Regarding "Repairs by Tenant," Paragraph 11 provides, in relevant part:

Tenant accepts the Premises in its present "As-Is" condition . . . . Tenant shall at its own cost and expense keep and maintain the Premises . . . in good order and repair promptly making all necessary repairs and replacements, including but not limited to, all equipment and facilities and components thereof within the Premises, fixtures, walls (interior), finish work, ceilings, floors, lighting fixtures, bulbs and ballasts, utility connections and facilities with the Premises, windows, glass, . . . bumpers, seals and enclosures, *cranes*, rail systems (if any), plumbing . . . .

*Id.* ¶ 11 (emphasis added).

Regarding "Alteration of Premises," Paragraph 13 provides:

> Tenant shall not alter, repair, or change the Premises at a cost in excess of $5,000.00 ("Tenant Repairs") without the prior written consent of Landlord which shall not be unreasonably withheld. All alterations, improvements or changes *shall remain a part of and be surrendered with the Premises*, unless Landlord directs its removal under <u>Paragraph 23</u> of this Lease.

*Id.* ¶ 13 (emphasis added).

Regarding the "Surrender of Premises," Paragraph 23 provides in relevant part:

> On or before the expiration of the Term, Tenant shall vacate the Premises in broom clean condition and otherwise in the same condition as existed on the Commencement Date, ordinary wear and tear and fire and casualty loss excepted, *except that any improvements made within and on the Premises by Tenant shall remain*, in the same condition and repair as when contracted or installed, reasonable wear and tear and fire and casualty loss excepted, *unless Landlord gives Tenant at least thirty (30) days prior written notice, which, if any, of such improvements in the Premises are to be removed.* . . . Tenant shall remove from the Premises all of Tenant's personal property and trade fixtures in order that Landlord can repossess the Premises on the day this Lease or any extension hereof expires or is sooner terminated. . . .

*Id.* ¶ 23 (emphasis added). The Master Lease does not define "improvement," "trade fixture," or "personal property." *See id.*

## B.     The Sublease

Shortly after the Master Lease was executed, ANCO Steel entered into a Sublease with Metal Partners on July 7, 2016, under which Metal Partners agreed to sublease the South Crane Bay (Sublease). ANCO Ex. 6. As used in the Sublease, ANCO Steel is the "Sublessor" and Metal Partners is the "Tenant." *Id.* The Landlord drafted the Sublease, and Anderson signed the Sublease on behalf of both ANCO Steel and Metal Partners. *Id.*; IR. Ex. 23, 33:12–16, 36:23–37:22. The Landlord signed the Sublease as an expression of the Landlord's written consent as required under Paragraph 29.1 of the Master Lease. ANCO Ex. 6, p. 3. In the South Crane Bay, Metal Partners fabricated and distributed rebar. ANCO Ex. 2, p. 4, ¶¶ 14, 15.

The "Recitals" of the Sublease provide:

On or about June 8, 2016 Sublessor entered into a Master Lease (the "Master Lease") with Landlord;

The Master Lease leased the Premises (as that term is defined in the Master Lease) to Sublessor for the term of five years;

Sublessor desires to lease and Tenant desires to rent a certain portion of the Premises for the duration of the Master Lease;

ANCO Ex. 6, p. 1.

Paragraph 2 of the Sublease, titled "Incorporation of Master Lease," provides:

Landlord has been fully advised of the provisions of this Sublease and consents to the terms thereof. The terms of the Master Lease are hereby incorporated into this Sublease. Tenant will perform and observe all covenants, conditions and terms of the Master Lease on the part of Sublessor with respect to the Space. Where the terms of this Sublease conflict with those of the Master Lease, the terms of the Master Lease will prevail and govern. Sublessor shall enjoy all of the rights and agrees to assume all liabilities contained in the Master Lease as those liabilities pertain to the Space only. Tenant may not further sublease the Space or assign this Sublease without Landlord's prior written consent pursuant to paragraph 29 of the Master Lease. Notwithstanding anything to the contrary herein, Sublessor acknowledges and agrees that Sublessor shall remain fully responsible to Landlord for the Premises and liable to Landlord for Sublessor's obligations, representations, warranties, covenants, and liabilities whatsoever made or owed under the Master Lease.

*Id.* ¶ 2. The term "Space" refers to the "South Crane Bay." *Id.* ¶ 1.

Paragraph 3 sets out the "Term" of the Sublease:

The term of this Sublease shall be for five years beginning the same date as the Commencement Date of the Master Lease. If at any time the Sublessor's leasehold interest in the Premises should terminate, whether by expiration or termination of the Sublessor's Master Lease with Landlord, this Sublease shall automatically terminate unless Tenant retains its leasehold interest in the Space through a direct lease with Landlord as mutually agreed upon by Landlord and Tenant.

*Id.* ¶ 3. The parties do not dispute that the initial five-year term of the Sublease ended on July 31, 2021. IR Ex. 24, ¶¶ 31, 32.

Rent under the Sublease was due "before the first day of each month after the

Commencement Date," ANCO Ex. 6, ¶ 4, and the Sublease provided that "Tenant shall pay

Sublessor Rent as follows: . . . $24,890 per month beginning on August 1, 2020, and continuing

through July 31, 2021," *id.* ¶ 4(e). Paragraph 5 addressing "Late Payment" provides: "Sublessor

shall have the same remedies as Landlord as explained in more detail in the Master Lease with

regard to late payments, default or any other form of non-compliance or non-payment by

Tenant." *Id.* ¶ 5.

**C.      Anderson's Sale of Metal Partners to Bergren; Metal Partners' Bankruptcy; InteRebar's Purchase of Metal Partners; and InteRebar's Assumption of the Sublease**

On December 23, 2016, Anderson, the "Seller," entered into a Limited Liability

Company Interest Purchase Agreement (LLC Purchase Agreement) with Frank Bergren, to sell

his 100% membership interest in Metal Partners, the "Company," to Bergren. ANCO Ex. 3,

23:10–11, 25:23–26:2, 41:7–17; IR Ex. C. The "Additional Covenants" section of the agreement

provides:

> The Company and ANCO are parties to a certain sublease dated July 7, 2016 (the
> "Sublease") for premises located at 4531 Columbia Avenue, Hammond, Indiana
> (the "Indiana Premises"). Seller acknowledges and agrees that the Company's
> ability to use and occupy the Indiana Premises on the terms and subject to the
> conditions of the Sublease is a critical component of the Company's business.
> Seller shall cause ANCO to take such actions as are necessary and appropriate to
> preserve the Company's rights to use and occupy the Indiana Premises during the
> term of the Sublease in accordance with the terms thereof.

IR Ex. C, § 4.5(c); *see also* ANCO Ex. 3, 139:14–21.

In June 2020, Metal Partners filed for Chapter 11 bankruptcy in the United States

Bankruptcy Court for the District of Nevada. ANCO Ex. 2, ¶ 18; IR Ex. 25, 11:5–13:5; IR Ex.

25, Dep. Ex. 2, ECF No. 79-4, p. 41. On October 14, 2020, the bankruptcy court approved an

Amended Asset Purchase Agreement (Asset Purchase Agreement) selling Metal Partners to

InteRebar.[2] ANCO Ex. 2, p. 5, ¶ 20. Section 2.1 of the Asset Purchase Agreement, titled

"Purchase and Sale," governed in detail InteRebar's acquisition of Metal Partners' "properties

and assets, real, person[al] or mixed, tangible and intangible" and listed sixteen categories of

assets that InteRebar purchased out of bankruptcy. ANCO Resp. Ex. 13, ECF No. 77-13.

      Schedule 2.1(b) of the Asset Purchase Agreement identifying "Assumed Contracts" lists

"Sublease Agreement dated 7/7/2016 for premises located at 4531 Columbia Ave., Hammond,

Indiana." ANCO Resp. Ex. 14, ECF No. 77-14, p. 5. It is undisputed that, as a result of the Asset

Purchase Agreement, InteRebar stepped into the shoes of Metal Partners for purposes of the

Sublease, ANCO Ex. 8, 35:9–14, and assumed control of Metal Partners' operations at the

Hammond plant, ANCO Ex. 17, 35:15–18.

      During Metal Partners' bankruptcy, the rent due under the Sublease continued to be paid.

ANCO Ex. 3, 44:24–45:3. After purchasing substantially all the Metal Partners assets out of

bankruptcy and assuming the Sublease, InteRebar paid the full rent due under the Sublease for

January through April 2021. *Id.* 47:14–17; ANCO Ex. 7, ¶ 4.

**D.**    **ANCO Steel Gives InteRebar Notice of the Expiration of the Sublease and Gives the Landlord Notice of ANCO Steel's Intent to Exercise Its Option to Extend the Master Lease for a Second Term**

      On January 12, 2021, Anderson for ANCO Steel emailed Joe Tedesco, CFO of

InteRebar, that "Anco Steel will be extending our lease on the Hammond property, and will

expand into the area you are currently using." ANCO Ex. 11. Tedesco responded, "Doug, Can

you give me more details, all the space, when?" *Id.* Anderson replied, "Your sublease ends at the

end of July." IR Ex. D, ECF No. 70-5, p. 45. Anderson intended for his email to let InteRebar

know that the Sublease would not be extended and agreed in his deposition that ANCO Steel

---

[2] At the time, InteRebar was known as JRC Opco, LLC, which changed its name to InteRebar shortly
after the asset purchase. ANCO Ex. 8, 10:15–11:5, IR Ex. 25, 59:21–23.

"refused to extend the Sublease." ANCO Ex. 3, 59:19–60:3, 126:1–5. ANCO Steel chose not to renew the Sublease because it "needed more space for its operations." IR Ex. J, ¶ 5. Joe Carrero, InteRebar's Managing Member, understood that the January 12, 2021 email was giving InteRebar a six-month notice. ANCO Ex. 8, 8:17–25, 79:25–80:3.

On January 20, 2021, Anderson, on behalf of ANCO Steel, emailed the Landlord that "ANCO Steel would like to exercise the option covering both bays of the building after the initial lease ends." ANCO Ex. 5.

Carrero testified that he called Anderson after learning of the email but that Anderson did not answer. ANCO Ex. 8, 47:12–19. Carrero then asked Louis Paula, InteRebar's plant manager, to speak with Anderson about the Sublease, and Paula reported back that "ANCO wanted their space and that we had to move out." *Id.* 49:1–22.

On April 28, 2021, Bill Koehler of ANCO Steel emailed Carrero, stating:

I have been asked by the lawyers of the Hammond property owner to send you a letter that requests your acknowledgement that the sublease assumed by [InteRebar] will end on July 31, 2021 and will not be renewed.

I appreciate your cooperation by signing and dating the attached letter and returning to me by email.

IR Ex. 29. The attached letter provided:

This letter is to notify you of the pending expiration of the sublease between ANCO Steel Company Inc. (ANCO) and [Metal Partners] dated July 7, 2016. The above referenced sublease was assumed by InteRebar Fabricators (InteRebar) upon the acquisition by InteRebar of certain assets and obligations of [Metal Partners] in a bankruptcy proceeding in 2020.

The sublease is set to expire on July 31, 2021, and ANCO Steel will not be offering InteRebar an option to renew the sublease after the current expiration date. Per the terms of the master lease, InteRebar must surrender the premise in the same condition as existed on the sublease commencement date excepted for ordinary wear and tear.

> If InteRebar should hold over and remain in possession of the premise after the sublease expiration date, monthly base rent will be due equal to 150% of monthly rent paid as of the last month of the sublease term ($37,335).
>
> By signing and returning this letter to ANCO, [InteRebar] acknowledges and affirms the sublease agreement between ANCO and InteRebar will terminate on July 31, 2021 and will not be renewed.

*Id.* InteRebar did not sign or return the letter. ANCO Ex. 8, 78:4–8.

In approximately May 2021, Carrero reached out to the Landlord about InteRebar entering into a direct lease for the South Crane Bay. *Id.* 43:20–44:17. The Landlord informed him that ANCO Steel had renewed the Master Lease and that Carrero would have to go through ANCO Steel. *Id.* 44:12–14.

InteRebar did not pay rent for May, June, or July 2021. *Id.* 55:14–17. Carrero testified that he instructed InteRebar's CFO to stop paying rent in May 2016 because InteRebar was "being kicked out when ANCO was renewing their master lease, and we should have had the right to stay in the facility." *Id.* 55:20–56:6, 155:15–156:16. On May 6, 2021, Koehler emailed Tedesco and Carrero noting that InteRebar had not paid rent for May 2021 and asking for prompt payment. ANCO Ex. 10.

In approximately the last week of July 2021, ANCO Steel changed the locks on the Premises. ANCO Ex. 17, 118:1–119:24. Paula, who was ANCO Steel's General Manager by then, testified that the locks were changed after the InteRebar employees had left and ANCO Steel was told they were not coming back. *Id.* 118:7–9. In contrast, Carrero testified that InteRebar was unable to get into the building to retrieve some of its inventory, including rebar, because the locks had been changed. ANCO Ex. 8, 41:19–42:9, 102:11–104:19.

Currently, ANCO Steel occupies the South Crane Bay. IR Ex. 23, 51:6–8. After InteRebar vacated the South Crane Bay, ANCO Steel sold scrap metal that remained in the South Crane Bay for a total of $51,234.25. *See* ECF No. 93, ¶ 162.

**E.     The Cranes in the South Crane Bay**

There were two cranes in the South Crane Bay when Metal Partners subleased the space from ANCO Steel in 2016. ANCO Ex. 3, 83:18–21. Anderson testified that the cranes were owned by the Landlord. *Id.* 83:24–84:2. The cranes ran on rails positioned on the sidewalls of the South Crane Bay and ran in an east–west direction. IR Ex. 28, 41:2–9. Metal Partners pushed the older, non-operational crane to the front of the South Crane Bay. *Id.* 45:18–20.

During the period that Metal Partners, and later InteRebar, subleased the South Crane Bay, the operational crane was modified. ANCO Ex. 3, 85:2–7, 86:2–5. The modifications allowed for a change in the direction of how the crane moved through the long South Crane Bay from east–west to north–south and also allowed the crane to pick up steel using magnets instead of only hooks. ANCO Ex. 3, 85:4–86:20, 160:1–6; IR Ex. 28, 42:22–43:23. A "mag system" is a system of magnets that hang from a beam lifted by a crane; when the magnets are placed on top of rebar, the charged magnets pick up the rebar. IR Ex. 28, 42:13–18. InteRebar had to "put in all the proper hoisting and end trucks so that [the mag system] can be charged correctly." *Id.* 43:12–16. InteRebar "only utilized the beams that were there" and "had to extend and fix, retrofit the beams that were there." *Id.* 44:13–16. T&M Equipment Company, Inc. performed the upgrade of the "Rebar Magnet System" to the crane in the South Crane Bay. *See* ANCO Ex. 13.

In an April 21, 2021 letter to Carrero, the Landlord asserted that the modified crane was its property:

> In addition, [all] overhead cranes located in your premise is the property of [the Landlord]. The magnetic lifting device is property of Intermetal Rebar and can be

removed at your expense. The crane must be restored to [a] normal operating condition as it was handed over to the tenant at lease commencement.

ANCO Ex. 12.

Anderson testified that ANCO Steel does not have and has never had possession of the magnet system associated with the modified crane in the South Crane Bay. ANCO Ex. 3, 88:5–13, 113:9–12. Carrero does not recall whether InteRebar removed the magnet system. ANCO Ex. 8, 40:17–41:24. However, he speculated that, "[i]f it was part of our asset purchase agreement, we would have taken it." *Id.* 40:21–23. Carrero testified that Andrew Duarte and a mechanic employed in InteRebar's Las Vegas facility would best know whether the magnet system was removed by InteRebar. *Id.* 41:3–15, 97:13–21. Carrero testified that if it was removed, "it probably went to New Castle or Las Vegas." *Id.* 97:22–25.

However, ANCO Steel admits that it is using the improved crane in the South Crane Bay for which Metal Partners paid. IR Ex. 26, ¶ 19.

**F.     Louis Paula's Employment with Metal Partners and InteRebar**

Paula entered into an employment agreement with Metal Partners on July 31, 2020, and was employed by Metal Partners on August 3, 2020, as its plant manager. ANCO Exs. 15, 16; ANCO Ex. 17, 13:21–14:6. Paula was told about Metal Partners' bankruptcy the following day on August 4, 2020. *Id.* 33:16–20. The employment agreement contains a "Confidentiality" provision in which Paula agreed, during his employment and at all times following the termination of his employment, not to disclose or use Metal Partners' confidential information. ANCO Ex. 15, ¶ 2.2. The employment agreement also contains a "Non-Competition and Non-Solicitation" section in which Paula agreed not to compete with Metal Partners during his employment and for a year following termination of his employment and agreed not to solicit

14

Metal Partner's clients or employees during his employment and for a period of eighteen months following termination of his employment. *Id.* ¶¶ 3.2–3.4.

In October 2020, Paula became an employee of InteRebar following its assumption of Metal Partners' operations at the Hammond plant. ANCO Ex. 17, 35:15–24. On March 1, 2021, Paula and Carrero had a harsh conversation, and Paula quit his employment with InteRebar that same day. ANCO Ex. 8, 66:10–16.

**G.     Paula's Subsequent Employment with ANCO Steel**

ANCO Steel advertised for a general manager position in January 2020 and a warehouse associate position in February 2020. ANCO Ex. 14, 13:2–14:10. On January 24, 2021, Paula emailed Cheryl Anderson, Director of Administration at ANCO Steel, stating, "I spoke with Doug the other day and he asked me to send you my resume." IR Ex. 30; *see also* ANCO Ex. 14, 6:17–20, 7:2–5. Cheryl Anderson interviewed Paula on January 26, 2021, for the general manager position. ANCO Ex. 14, 26:6–14, 28:24–29:10; IR Paula Ex. 19, ECF No. 83-8. It was Cheryl Anderson's standard practice to ask an applicant for names of anybody available to fill open positions at ANCO Steel; she does not remember if she asked this of Paula but testified she probably did. ANCO Ex. 14, 27:22–28:23. On February 11, 2021, Paula received an offer of employment from ANCO Steel. ANCO Ex. 17, 84:1–9. On March 8, 2021, Paula began his employment with ANCO Steel as its general manager. *Id.* 10:22–24.

On February 9, 2021, Luis Adame, and on February 23, 2021, Carlos Adame and Epifanio Adame, all of whom worked for InteRebar, each applied for employment at ANCO Steel. IR Exs. 32, 34, 36, 40. On March 25, 2021, March 22, 2021, and March 15, 2021, Paula, as ANCO Steel's general manager, signed an ANCO Steel Company Offer of Employment Request Form for each, respectively. IR Exs. 33, 35, 37.

15

**H.      Paula's Communications with InteRebar Employees**

Paula testified that he never told InteRebar employees that the Hammond plant was

shutting down. ANCO Ex. 17, 61:5–7. However, InteRebar salesman Rick Kenney testified that

Paula talked to him frequently about InteRebar going out of business. ANCO Ex. 19, 64:11–16.

Kenney also testified that he confronted Paula about Paula having told InteRebar's employees

that InteRebar was going under and that Paula admitted it. *Id.* 54:23–55:22. Yet, Kenney never

heard Paula encourage employees to seek employment at ANCO Steel. *Id.* 65:9–13.

Paula testified that, during late January and early February 2021, he did not tell any

InteRebar employee that he was interviewing with ANCO Steel or that their job was unstable.

ANCO Ex. 17, 77:18–24, 87:8–11. He also never told any InteRebar employees that he could get

them a job at ANCO Steel during that time. *Id.* 78:7–10. He testified that he never spoke to

Carlos, Luis, or Epifanio Adame about jobs at ANCO Steel and that all three had been

interviewed before Paula started with ANCO Steel. *Id.* 78:11–79:3, 114:13–19.

Kenney testified that, after Paula stopped working for InteRebar, Paula let him know that

there was an "open door" there for him at ANCO Steel, although Paula did not directly ask him

to work for ANCO Steel. ANCO Ex. 19, 62:23–63:2. Chris Motley, an employee of InteRebar,

stated that within two months of Paula leaving InteRebar, Paula called him and told him should

consider coming to work for his new company, ANCO Steel. IR Ex. 41, ¶ 5.

**I.      The Adame Brothers' Testimony**

During Metal Partners' bankruptcy, checks to employees were bouncing and Carlos

Adame recalls three instances of this occurring. ANCO Ex. 20, 16:12–16. As a result of the

transition from Metal Partners to InteRebar, Carlos lost five vacation days. *Id.* 17:17–21. Carlos

and Paula "bumped heads" both at InteRebar and at ANCO Steel. *Id.* 30:10–14. If Carlos had

known that Paula applied for a job at ANCO Steel, he would not have applied. *Id.* 32:13–17. Carlos left InteRebar because they had no material, and he was only working six- or seven-hour days. *Id.* 36:3–10. He did not hear from Paula that ANCO Steel was hiring. *Id.* 31:20–22.

Neither Luis Adame nor Epifanio Adame heard from Paula that ANCO Steel was hiring, that InteRebar was shutting down, or that InteRebar management was "not in it for the long haul." ANCO Ex. 21, 15:6–11, 23:20–22; ANCO Ex. 22, 27:9–12, 29:10–21. Epifanio applied to work for ANCO Steel in February 2021 because he had no overtime at InteRebar, and he was only working six-hour days. ANCO Ex. 22, 30:13–18. He did not know that Paula had applied for a job with ANOC Steel. *Id.* 30:5–8. Epifanio testified that he did not like Paula when they worked together because Paula is strict. *Id.* 39:23–40:2. However, according to ANCO Steel's human resources file, Epifanio notified Paula that ANCO Steel was hiring. IR Ex. 39. The day of Cheryl Anderson's Rule 30(b)(6) deposition, Epifanio's name was crossed off with a notation of "corrected 7/22/[22]." *Id.*[3]

## ANALYSIS

### A.    ANCO Steel's Complaint Count II—Breach of Sublease by InteRebar

ANCO Steel moves for summary judgment on its claim that InteRebar breached the Sublease by failing to pay rent in May, June, and July 2021. To succeed on a breach of contract claim under Indiana law, a plaintiff must prove the existence of a contract, the defendant's breach, and damages. *Berg v. Berg*, 170 N.E.3d 224, 231 (Ind. 2021).[4]

---

[3] Although the handwritten correction provides "corrected 7/22/23," it appears that the year of the notation should have been 2022 because Cheryl Anderson testified at her July 22, 2022 deposition that the reference to Epifanio Adame was incorrect, *see* ANCO Ex. 14, 36:4–10, and InteRebar Exhibit 39 was filed with the Court on January 23, 2023, *see* ECF No. 79-18.

[4] The Master Lease provides that it "shall be governed by the laws of the state of Indiana." ANCO Ex. 4, ¶ 40.1. The parties do not dispute that Indiana law governs the breach of Sublease claims.

There is no dispute that ANCO Steel and InteRebar, as successor to Metal Partners, were parties to a contract—the Sublease. The Sublease required that InteRebar pay rent before the first day of each month and that the rent was $24,890 per month beginning on August 1, 2020, and continuing through July 31, 2021. It is also undisputed that InteRebar did not pay ANCO Steel rent for May, June, and July 2021. Paragraph 22 of the Master lease provides that failure to pay rent is a breach of the Master Lease, and Sublease Paragraph 5 provides that ANCO Steel as Sublessor has the same rights as the Landlord under the Master Lease for nonpayment by InteRebar, the Tenant. Thus, ANCO Steel has been damaged in the amount of the unpaid rent of $74,670.00, in addition to its other contractual remedies. ANCO Steel has met its burden on all elements of its breach of contract claim against InteRebar, with the total amount of contract damages to be determined.

In response, InteRebar contends that it was excused from performance under the Sublease because ANCO Steel committed a first material breach of the Sublease. *See Coates v. Heat Wagons, Inc.*, 942 N.E.2d 905, 917 (Ind. Ct. App. 2011) ("When one party to a contract commits the first material breach of that contract, it cannot seek to enforce the provisions of the contract against the other party if that other party breaches the contract at a later date."). InteRebar asserts that it had an option to extend the Sublease to remain in the South Crane Bay for a second five-year term. InteRebar then reasons that ANCO Steel anticipatorily repudiated InteRebar's alleged option to extend when Anderson emailed Tedesco on January 12, 2021, to inform InteRebar that ANCO Steel would be expanding into the South Crane Bay after InteRebar's Sublease ended on July 31, 2021. InteRebar contends this repudiation constituted a first material breach of the Sublease by ANCO Steel that excused InteRebar from paying rent in May, June, and July 2021.

18

However, as set forth in the next section addressing InteRebar's counterclaim for breach of the Sublease on the same grounds of anticipatory repudiation, the Court find as a matter of law that the Sublease did not grant InteRebar an option to extend. Therefore, ANCO Steel did not breach the Sublease by not offering InteRebar an option to extend, and InteRebar is not excused from its performance under the Sublease. Accordingly, the Court grants ANCO Steel's motion for summary judgment on Count II of its Complaint against InteRebar for the three months of unpaid rent in the amount of $74,670.00 as well as its other contractual remedies.

**B.     InteRebar's Counterclaim Count I—Breach of Sublease by ANCO Steel**

In Count I of the Amended Counterclaim, InteRebar alleges that ANCO Steel breached the Sublease when ANCO Steel refused to extend the Sublease for a second five-year term. The parties filed cross motions for summary judgment on this claim. Based on the plain language of the Sublease, the Court finds that InteRebar has failed to establish that it had a contractual option to extend the Sublease and grants summary judgment for ANCO Steel on this claim.

As set forth in the previous section, a breach of contract claim requires the existence of a contract, a breach, and damages. *Berg*, 170 N.E.3d at 231. It is undisputed that ANCO Steel and Metal Partners entered into the Sublease and that InteRebar assumed the Sublease through the Asset Purchase Agreement in Metal Partners' bankruptcy. However, the parties dispute whether the Sublease granted InteRebar an option to extend the Sublease for a second five-year term. InteRebar contends that the unambiguous terms of the Sublease granted it an option to extend the Sublease in the event ANCO Steel exercised its own option to extend the Master Lease, and ANCO Steel responds that InteRebar did not have an option to extend because ANCO Steel did not assign its option. The Court finds that the unambiguous terms of the Sublease do not grant InteRebar an option to extend.

19

"Interpretation and construction of contract provisions are questions of law." *B&R Oil Co. v. Stoler*, 77 N.E.3d 823, 827 (Ind. Ct. App. 2017). Indiana courts interpret contracts to effectuate the intent of the contracting parties "as reasonably manifested by the language of the agreement." *Reuille v. E.E. Brandenberger Constr., Inc.*, 888 N.E.2d 770, 771 (Ind. 2008) (citation omitted). When a contract's language is unambiguous, courts "apply its plain and ordinary meaning in light of the whole agreement, 'without substitution or addition.'" *Hartman v. BigInch Fabricators & Constr. Holding Co.*, 161 N.E.3d 1218, 1223 (Ind. 2021) (quoting *Care Grp. Heart Hosp., LLC v. Sawyer*, 93 N.E.3d 745, 752 (Ind. 2018)). "A word or phrase is ambiguous if reasonable people could differ as to its meaning." *Franciscan All. Inc. v. Metzman*, 192 N.E.3d 957, 963 (Ind. Ct. App. 2022) (citation omitted). However, mere disagreement between the parties about a term's plain meaning does not create an ambiguity. *G&G Oil Co. of Ind. v. Cont'l W. Ins. Co.*, 165 N.E.3d 82, 87 (Ind. 2021). "Courts do not have the power . . . to insert language into a contract which was not inserted by the parties, and [courts] will not undertake to rewrite the parties' contract to include such a clause." *Gen. Motors Corp. v. Northrop Corp.*, 685 N.E.2d 127, 135 (Ind. Ct. App. 1997) (cleaned up).

Here, no express language in either the Sublease or the Master Lease grants InteRebar, the "Tenant" on the Sublease, an option to extend the Sublease. Thus, to arrive at its interpretation of the Sublease, InteRebar pieces together the incorporation clause of the Sublease and the option to extend provision of the Master Lease with case law labeling an option to extend as a "liability." As set forth below, this interpretation is not supported by the plain language of the contract.

InteRebar starts with the Sublease's "Incorporation of Master Lease" clause, which provides that "[t]he terms of the Master Lease are hereby incorporated into this Sublease" and

20

"[w]here the terms of this Sublease conflict with those of the Master Lease, the terms of the Master Lease will prevail and govern." Indiana courts interpret incorporated content as part of the agreement when "the incorporating contract . . . include[s] a clear and explicit expression of intent to be bound by the auxiliary content." *Sawyer*, 93 N.E.3d at 754–55. The Court agrees that the Master Lease and the Sublease should be read together as set forth in the Sublease.

InteRebar notes that the parties intended to synchronize the terms of the Sublease and the Master Lease, as the recitals of the Sublease provide: "Sublessor desires to lease and Tenant desires to rent a certain portion of the Premises for the duration of the Master Lease." Indeed, the five-year term of the Sublease is defined in reference to the five-year term of the Master Lease, with the Sublease beginning on the Commencement Date of the Master Lease. As a result, the five-year terms of both the Master Lease and the Sublease ended July 31, 2021.

InteRebar then cites Master Lease Paragraph 34, which grants ANCO Steel, as Tenant under the Master Lease, "one (1) Option to Extend the Term for the Premises for an additional five (5) years ("Option Term")." There is no similar provision in the Sublease granting InteRebar an option to extend the Sublease in the event ANCO Steel exercises its option to extend the Master Lease. Nevertheless, InteRebar reasons that it had an option to extend the Sublease through Paragraph 34 of the Master Lease because an option is a liability under Indiana law[5] and Paragraph 2 of the Sublease, the "Incorporation of Master Lease" provision, required ANCO Steel "to assume all liabilities contained in the Master Lease, as those liabilities pertain to the

---

[5] InteRebar cites *Coons v. Baird*, in which the court recognized that "[b]y an option the owner does not sell his property, but he does subject himself to the liability of having to convey the property if the option is exercised within the time and in the manner stipulated." 265 N.E.2d 727, 731 (Ind. Ct. App. 1970). In *Coons*, the parties disputed the title over a parcel of land subject to an option to purchase. *Id.* at 729. A preliminary question on appeal was whether the option to purchase had been exercised, and the court found that it had not. *id.* at 730. It was in that context that the court observed the principle that an option to purchase subjects the owner to a "liability." *Id.* at 731. Thus, *Coons* considered only whether an existing option had been exercised.

[South Crane Bay] only." In other words, InteRebar reasons that an option is a liability; ANCO Steel, as Sublessor, assumed all the liabilities of the Master Lease as to the South Crane Bay; the Master Lease granted ANCO Steel an option to extend the Master Lease; thus, ANCO Steel assumed the liability of granting InteRebar an option to extend the Sublease.

However, the plain language of the Sublease and the Master Lease do not support this interpretation, and InteRebar cannot create an option to extend where one does not exist. As argued by ANCO Steel, Master Lease Paragraph 34 granting ANCO Steel the option to extend the Master Lease includes an anti-assignment clause: "The Option to Extend is personal to Tenant and may not be assigned without Landlord's written consent which may be withheld in its sole discretion." ANCO Steel never assigned its option to extend. Similarly, Master Lease Paragraph 29.1 provides that ANCO Steel cannot sublease the Premises or any portion thereof "without the Landlord's written consent in each instance." As cited by ANCO Steel, Indiana law recognizes the assignment of contractual rights. *See Traicoff v. Digit. Media, Inc.*, 439 F. Supp. 2d 872, 879 (S.D. Ind. 2006) (citing *Chrysler Fin. Co., LLC v. Ind. Dep't of State Revenue*, 761 N.E.2d 909, 912 (Ind. Tax 2002)). And while "parties may include an anti-assignment provision in the contract, . . . careful detail must be given to the language of such [a] provision" to ascertain its limits. *Id.* Here, the Master Lease's anti-assignment provisions are specific to "Subletting" in Paragraph 29.1 and to the "Option to Extend" in Paragraph 34.

In response, InteRebar recognizes that the Master Lease prohibits assignment or sublease of the Premises without the Landlord's written consent. But InteRebar argues that ANCO Steel assigned its option to extend and that the Landlord gave written consent for the assignment when ANCO Steel and the Landlord executed the Sublease, which incorporated the terms of the Master Lease. But again, this interpretation is not supported by the plain language of the

contract. There is no reference in the Sublease or the Master Lease to granting an option to extend the Sublease to which the Landlord would have been giving written consent. Importantly, Master Lease Paragraph 29.2 provides: "The consent by Landlord to any Assignment or Sublease shall not relieve Tenant of the obligation to obtain Landlord's *express* written consent to any other assignment or Sublease." In other words, the Landlord's consent to the Sublease by itself, even with its incorporation of the Master Lease, cannot constitute the Landlord's consent to an assignment of ANCO Steel's option to extend the Master Lease or to a renewal of the Sublease because the Landlord did not give "express" written consent to either.

Other language in the documents further demonstrates that the Sublease is silent as to an option to extend the Sublease. Paragraph 2.1 of the Master Lease, titled "Term," provides that the term of the Master Lease is for five years, beginning on the Commencement Date, "*unless extended* . . . pursuant to the terms of this Lease." Paragraph 34 of the Master Lease, which sets out ANCO Steel's option to extend, expressly provides that the Term of the Master Lease, "as defined in Paragraph 2 hereof, shall also include the Option to Extend properly exercised hereunder." In other words, the option to extend was explicitly part of the Term of the Master Lease. In contrast, Sublease Paragraph 3, titled "Term," provides only that the term of the Sublease "shall be for five years beginning the same date as the Commencement Date of the Master Lease." The provision is conspicuously silent as to any extension of the term of the Sublease in general or in the event ANCO Steel exercises its option to extend the Master Lease. Rather, Sublease Paragraph 3 addresses what happens if ANCO Steel's leasehold in the Premises under the Master Lease terminates (whether by expiration or termination of the Master Lease)— the Sublease also terminates, unless InteRebar retains its leasehold in the South Crane Bay by entering into a direct lease with the Landlord.

The documents' treatment of rent schedules further supports a finding that the Sublease does not contain an option to extend. Master Lease Paragraph 3 provides a monthly rent schedule for the five-year Term of the Master Lease through July 31, 2021. Likewise, Sublease Paragraph 4 provides a monthly rent schedule for the five-year Term of the Sublease through July 31, 2021. The Option to Extend provision of Master Lease Paragraph 34 further provides the monthly base rent for each of the five years of the Option Term through July 31, 2026. Yet, neither the Sublease nor the Master Lease provides a rent schedule for an option term of the Sublease.

In addition, when a specific term of the Master Lease is to be incorporated into the Sublease, the Sublease expressly incorporated the term. For example, Sublease Paragraph 5 on "Late Payment" provides: "Sublessor shall have the same remedies as Landlord as explained in more detail in the Master Lease with regard to late payments, default or any other form of non-compliance or non-payment by Tenant." Also, Sublease Paragraph 6 on "Insurance" provides: "Tenant and Sublessor shall maintain insurance in accordance with paragraph 14.2 of the Master Lease." However, no provision of the Sublease expressly incorporates the "Options to Extend" Paragraph 34 of the Master Lease.

The Court finds that the plain language of the Sublease, including the incorporated Master Lease, does not grant InteRebar an option to extend the Sublease. ANCO Steel's option to extend the Master Lease was personal to ANCO, and ANCO never assigned the option to extend. Moreover, any assignment of the option required the Landlord's express written consent, and no such written consent was given. Because InteRebar had no contractual option to extend the Sublease, InteRebar cannot maintain its breach of contract claim against ANCO Steel. Accordingly, the Court grants ANCO Steel's motion for summary judgment on Count I of the Amended Counterclaim and denies InteRebar's corresponding cross motion. Because the Court

finds that the Sublease did not grant InteRebar an option to extend the Sublease, the Court does not reach the parties' other arguments.

**C.      InteRebar's Counterclaim Count II—Criminal Conversion Against ANCO Steel**

In Count II of the Amended Counterclaim, InteRebar alleges that ANCO Steel wrongfully took possession of InteRebar's equipment in the South Crane Bay and that ANCO Steel continues to knowingly and intentionally exert unauthorized control over the equipment for its own use. InteRebar seeks treble damages under Indiana Code § 34-24-3-1. ANCO Steel moves for summary judgment on this claim.

In their briefing, both ANCO Steel and InteRebar treat the claim as one for criminal conversion. Criminal conversion is committed when "[a] person . . . knowingly or intentionally exerts unauthorized control over property of another person." Ind. Code § 35-43-4-3(a). The Indiana Crime Victim's Relief Act allows a civil plaintiff to recover pecuniary losses as a result of a criminal conversion. *See CT102 LLC v. Auto. Fin. Corp.*, 175 N.E.3d 869, 873 (Ind. Ct. App. 2021) (citing *Larson v. Karagan*, 979 N.E.2d 655, 661 (Ind. Ct. App. 2012)). The Court considers this standard as to each of the allegedly converted items, namely the magnet system, the modified crane, and the rebar and scrap steel inventory left behind by InteRebar.

*1.      InteRebar's Magnet System*

The evidence of record is that Metal Partners purchased a magnet system for the operational crane in the South Crane Bay, and InteRebar acquired the magnet system through the Amended Asset Agreement in Metal Partners' bankruptcy. In the April 2021 letter to Carrero, the Landlord recognized that "[t]he magnetic lifting device is property of [InteRebar] and can be removed at your expense." However, for purposes of this criminal conversion claim, the record is devoid of any evidence that ANCO Steel has or has had possession of InteRebar's magnet

25

system. Anderson testified that the magnet system was never in ANCO Steel's possession. There are no unequivocal witness statements or evidence that InteRebar itself does not have possession of its magnet system. Rather, Carrero testified that InteRebar likely took its magnet system when it vacated the South Crane Bay. In response, InteRebar offers no evidence to show that the magnet system is in the possession or control of ANCO Steel. Because InteRebar has failed to meet its burden, the Court grants ANCO Steel's motion for summary judgment on the criminal conversion claim in Count II of the Amended Counterclaim as to InteRebar's magnet system.

2.    *The Modified Crane*

The parties agree that there were two cranes in the South Crane Bay when Metal Partners first occupied the space in 2016, both of which were owned by the Landlord. The parties agree that one of the cranes was out of use and that the newer crane was modified by Metal Partners. ANCO Steel admits that it is currently using the modified crane in the South Crane Bay.[6] ANCO Steel seeks summary judgment on this claim, arguing that the Landlord owns the modified crane and that there is no evidence that the modifications made to the crane transferred ownership of the crane from the Landlord to InteRebar. The Court agrees.

First, the terms of Master Lease demonstrate that the cranes in the South Crane Bay were the Landlord's property. As set out fully in the fact section above, the "Premises" is defined as the 126,422 square feet of space that includes the South Crane Bay. Paragraph 11, which addresses "Repairs by Tenant," includes "cranes" as part of the "Premises" to which the Tenant

---

[6] Although InteRebar's Statement of Additional Material Facts and ANCO Steel's Response thereto dispute whether Metal Partners installed a third, entirely new crane in the South Crane Bay, *see* ECF No. 93, ¶¶ 141, 148, 150–53, 156; *see also* ECF No. 66, pp. 13–14, the dispute is not material because InteRebar does not discuss the third, "new" crane in its argument defending this claim. *See* ECF No. 78 at 22–24. Rather, InteRebar argues that the modifications to the Landlord's existing, operational crane, which included several significant replacement parts, were paid for by Metal Partners, were Metal Partners' tangible personal property purchased by InteRebar in the bankruptcy, and that questions of fact remain whether the modified crane belongs to the Landlord or InteRebar. *See id.*

must promptly make all necessary repairs and replacements. Paragraph 13, which addresses "Alteration of Premises," further provides that "[a]ll alterations, improvements or changes shall remain a part of and be surrendered with the Premises, unless Landlord directs its removal under Paragraph 23 of this Lease."

Moreover, the Landlord wrote to Carrero in April 2021 that "all overhead cranes located in your premise is the property of [the Landlord]." In contrast, the Landlord recognized in the same letter that the magnet system was the property of InteRebar and could be removed at InteRebar's expense. The Landlord further wrote: "The crane must be restored to a normal operating condition as it was handed over to the tenant at lease commencement." There is no evidence that InteRebar contested the Landlord's position.

In its response brief, InteRebar contends that ANCO Steel's characterization of Metal Partners' investment in the crane as a "modification" devalues the additions that occurred, which resulted in the replacement of the crane's three main component parts. Thus, InteRebar reasons that, although Paragraph 13 of the Master Lease states that "[a]ll alterations, improvements or changes shall remain a part of and be surrendered with the Premises," Paragraph 23 requires the Tenant to remove from the Premises all "personal property and trade fixtures." Noting that neither "personal property" nor "trade fixture" is defined in the Master Lease and citing Indiana law, InteRebar argues that questions of fact remain as to whether the modified crane is a tenant improvement belonging to the Landlord or a trade fixture belonging to InteRebar.[7] Notably,

---

[7] InteRebar notes that, under Indiana law, "[a] 'trade fixture' is 'personal property put on the premises by a tenant which can be removed without substantial or permanent damage to the premises.'" *Dutchmen Mfg., Inc. v. Reynolds*, 849 N.E.2d 516, 520 (Ind. 2006) (citation omitted). InteRebar also notes that "[a] piece of equipment is typically thought of as personal property." *Dinsmore v. Lake Elec. Co.*, 719 N.E.2d 1282, 1286 (1999). However, in *Reynolds*, the Indiana Supreme Court also recognized that "a trade fixture installed by a tenant merges with the realty and thereby becomes the property of the landlord if it is left on the premises after the tenant leaves the premises." 849 N.E.2d at 520. And, in *Dinsmore*, the court set out the three-part test to "determine whether a particular article has become so identified with

27

InteRebar also recognizes that when making this determination, Indiana courts consider the intention of the parties to be controlling. *See Dinsmore v. Lake Elec. Co.*, 719 N.E.2d 1282, 1286–87 (1999). Yet, InteRebar ignores that Paragraph 11 of the Master Lease includes "cranes" as part of the Premises that the Tenant is required to maintain but that is owned by the Landlord. When Paragraph 11 is read with the Paragraph 13's requirement that "[a]ll alterations, improvements or changes shall remain a part of and be surrendered with the Premises," the contractual language represents the parties' intent that improvements to the cranes in the South Crane Bay remain the property of the Landlord.

InteRebar has not offered evidence to create a genuine dispute of material fact to show that Metal Partners' modifications to the Landlord's operational crane in the South Crane Bay transferred ownership to InteRebar through its acquisition of Metal Partners' assets in bankruptcy. Thus, the Court grants ANCO's Steel motion for summary judgment on the criminal conversion claim in Count II of the Amended Counterclaim as to the crane.

3.      *The Steel Inventory Sold for $51,234.25*

In its response to ANCO Steel's motion, InteRebar argues that ANCO Steel sold InteRebar's rebar and other material inventory left in the South Crane Bay after InteRebar vacated the premises for a total of $51,234.25. ANCO Steel admits that it took possession of the inventory when it occupied the South Crane Bay and sold it for scrap for that amount. However, the parties also agree that there are questions of fact for the jury about whether InteRebar abandoned the scrap metal in light of Paula's testimony that ANCO Steel only changed the locks after it was told InteRebar had moved out and was not coming back or whether ANCO Steel

---

real property as to become a fixture": "1) actual or constructive annexation of the article to the realty, 2) adaptation to the use or purpose of that part of the realty with which it is connected, and 3) the intention of the party making the annexation to make the article a permanent accession to the freehold." 719 N.E.2d at 1286 (citation omitted). "It is the third part of the test which is controlling." *Id.* at 1287 (citation omitted).

locked InteRebar out of the South Crane Bay prior to the expiration of the Sublease on July 31, 2021, depriving InteRebar of access to its inventory. Accordingly, the Court denies ANCO Steel's motion on the criminal conversion claim in Count II of InteRebar's Amended Counterclaim as to the rebar and other materials left in the South Crane Bay.

**D.      InteRebar's Third-Party Complaint Count VIII—Breach of Contract by Anderson**

InteRebar's breach of contract claim against Douglas Anderson in Count VIII of the Amended Third-Party Complaint is premised on the LLC Purchase Agreement executed when Anderson sold Metal Partners to Bergren. InteRebar alleges that Metal Partners was a third-party beneficiary under the LLC Purchase Agreement, that InteRebar succeeded to Metal Partners' interest in the LLC Purchase Agreement through the Asset Purchase Agreement in Metal Partners' bankruptcy, and that Anderson breached the LLC Purchase Agreement when Anderson failed to prevent ANCO Steel from breaching the Sublease.

In their cross motions for summary judgment, the parties dispute whether Metal Partners was a third-party beneficiary under the LLC Purchase Agreement and whether InteRebar succeeded to that alleged interest through the Asset Purchase Agreement. The Court need not resolve either dispute because InteRebar's claim against Anderson is premised on Anderson allegedly failing to prevent ANCO Steel from breaching the Sublease and, as set forth above, the Court finds that ANCO Steel did not breach the Sublease. Accordingly, the Court grants Anderson's motion for summary judgment and denies InteRebar's motion for summary judgment on Count VIII of the Amended Third-Party Complaint.

**E.      InteRebar's Counterclaim and Third-Party Complaint Counts III, IV, and V against ANCO Steel and Louis Paula**

In response to ANCO Steel's and Paula's motions for summary judgment, InteRebar concedes that summary judgment is proper on Counts III, IV, and V of InteRebar's Amended

29

Counterclaim and Third-Party Complaint. Therefore, the Court grants ANCO Steel's motion for summary judgment on Counts III, IV, and V of InteRebar's Amended Counterclaim and grants Paula's motion for summary judgment on Counts IV and V of the InteRebar's Amended Third-Party Complaint.

**F.      InteRebar's Remaining Third-Party Claims against Louis Paula—Counts VI, VII**

*1.      Breach of Employment Contract (Count VI)*

In Count VI of the Amended Third-Party Complaint, InteRebar is suing Paula for breach of the confidential information (Paragraph 2.2), non-compete (Paragraph 3.2), and non-solicitation (Paragraphs 3.3 and 3.4) covenants of the July 31, 2020 employment agreement between Paula and Metal Partners. Paula seeks summary judgment on the basis that the non-compete and non-solicitation covenants violate the Illinois Freedom to Work Act, 820 ILCS 90/1, *et seq*. He also argues that there is no evidence that he ever misused InteRebar's confidential information.

First, the Plaintiff invokes the Illinois Freedom to Work Act to argue that the non-compete and non-solicitation covenants in Paragraphs 3.2–3.4 are unenforceable. The parties dispute whether Illinois or Indiana substantive law applies to the employment agreement, with Paula arguing that the choice of law provision in the employment agreement requires application of Illinois law and InteRebar responding that Indiana law applies because Illinois has no substantial relationship to the parties or the transaction and because application of Illinois law would be contrary to a fundamental policy of Indiana law. The Court need not resolve the choice of law issue at this stage of the litigation because, as argued by InteRebar and recognized by Paula in his reply brief, the Illinois Freedom to Work Act was not effective until January 1, 2022, and thus is inapplicable to the 2020 employment agreement and Paula's alleged actions in the

30

spring 2021 related to his employment at ANCO Steel. *See* 2021 Ill. Legis. Serv. P.A. 102-358,

§§ 5, 20, 25, 99 (S.B. 672) (West); 820 Ill. Comp. Stat. § 90 (amends. eff. Jan. 1, 2022).[8] For this

reason, the Court denies Paula's motion for summary judgment brought under the Illinois

Freedom to Work Act as to the alleged breach of the covenants in Paragraphs 3.2–3.4 of the

employment agreement.

    Second, Paula seeks summary judgment on the claim brought under Paragraph 2.2 of the

employment agreement, arguing there is no evidence that he misused InteRebar's confidential

information. Paula contends that InteRebar cannot point to any data or information that is

proprietary, cannot prove that Paula had access to any such proprietary information if it in fact

existed, and cannot prove that Paula misused any such information. InteRebar did not respond to

this argument and did not identify any confidential information that Paula allegedly misused.

Thus, the Court grants summary judgment in favor of Paula solely on the breach of contract

claim brought under Paragraph 2.2 of the employment agreement for misuse of confidential

information.

    Accordingly, the Court grants Paula's motion for summary judgment as to the alleged

breach of Paragraph 2.2 of the employment agreement based on misuse of confidential

information but denies Paula's motion as to the alleged breach of the non-compete and non-

solicitation covenants in Paragraphs 3.2–3.4 of the employment agreement.

---

[8] In his reply brief for the first time, Paula invokes Illinois common law to argue that the covenants are
not enforceable. However, Paula waived this argument by not bringing it in his opening brief. *See
Wolotka v. Town of Munster*, 399 F. Supp. 2d 885, 901 (N.D. Ind. 2005) ("[A]rguments raised for the first
time in a reply brief are waived."); *Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*, 950 F.3d
959, 968 (7th Cir. 2020) ("District courts abuse their discretion when they deny a party a chance to
respond to new arguments or facts raised for the first time in a reply brief in support of a motion for
summary judgment and subsequently enter judgment on the basis of those new arguments or facts.").

2.      *Breach of Fiduciary Duty (Count VII)*

In Count VII of the Amended Third-Party Complaint, InteRebar alleges that Paula owed InteRebar a fiduciary duty of loyalty and breached it in several ways prior to terminating his employment with InteRebar. A breach of fiduciary duty claim under Indiana law requires InteRebar to prove "(1) the existence of a fiduciary relationship; (2) a breach of the duty owed by the fiduciary to the beneficiary; and (3) harm to the beneficiary." *West v. J. Greg Allen Builder, Inc.*, 92 N.E.3d 634, 643 (Ind. Ct. App. 2017) (citation omitted). Paula moves for summary judgment on this claim, arguing that there is no evidence that he breached his fiduciary duty to InteRebar while he was still its employee. In response, InteRebar drops all bases for this claim except for Paula's alleged solicitation of InteRebar's employees, specifically the three Adame brothers. The Court finds that InteRebar has failed to offer evidence that creates a genuine dispute of material fact as to whether Paula, while he was still employed by InteRebar, solicited InteRebar employees Luis, Carlos, and Epifanio Adame to work at ANCO Steel.

Sometime in January 2021, ANCO Steel President Doug Anderson and Paula talked about employment at ANCO Steel. Paula interviewed with Cheryl Anderson at ANCO Steel on January 26, 2021, received an offer of employment on February 11, 2021, quit working at InteRebar on March 1, 2021, and began his employment with ANCO Steel as its General Manager on March 8, 2021. On February 9, 2021, InteRebar employee Luis Adame applied for work at ANCO Steel, and on February 23, 2021, Luis's brothers Carlos Adame and Epifanio Adame also applied. ANCO Steel's human resources file initially listed Epifanio Adame as the person who told *Paula* that ANCO Steel was hiring; this notation was crossed out shortly after Cheryl Anderson's deposition. The Adame brothers were hired by ANCO Steel in mid to late March 2021.

32

Paula testified that, during late January and early February 2021, he did not tell any InteRebar employees that he was interviewing with ANCO Steel or that their jobs were unstable. He also testified that he never told any InteRebar employees that he could get them a job at ANCO Steel during that time. He testified that he never spoke to Carlos, Luis, or Epifanio Adame about jobs at ANCO Steel, and they testified similarly. Carlos testified that he left InteRebar because he was only working six- or seven- hour days, and Epifanio testified that he left InteRebar because he had no overtime and was only working six-hour days.

Attempting to create an inference that Paula solicited the Adame brothers to work at ANCO Steel, InteRebar cites InteRebar employee Rick Kenney testimony that Paula frequently told him that InteRebar was going out of business and that Paula admitted to Kenney that Paula told other InteRebar employees that InteRebar was "going under." However, Kenney also testified that he never heard Paula encourage employees to seek employment at ANCO Steel. *After* leaving InteRebar, Paula suggested that Kenney contact him if he needed a job and suggested to Chris Motley that he should look for work at ANCO Steel. But Paula's conduct after he left InteRebar cannot form the basis of this breach of fiduciary duty claim. InteRebar also notes that, as part of her usual practice, Cheryl Anderson would ask interviewees if they knew of any candidates for other open ANCO Steel positions; however, she does not remember if she asked Paula this question during his interview.

InteRebar argues that a reasonable fact finder could conclude that Paula and the Adame brothers are not credible and that Paula breached his fiduciary duty by recruiting them while still employed by InteRebar. However, "[a] properly supported motion for summary judgment cannot be defeated by simply arguing that a jury might not believe a witness's testimony." *Beatty v. Olin Corp.*, 693 F.3d 750, 754 (7th Cir. 2012). The other evidence cited by InteRebar does not create

an inference that Paula solicited the Adame brothers to work at ANCO Steel. Accordingly, the

Court grants Paula's motion for summary judgment on InteRebar's breach of fiduciary duty

claim in Count VII of the Amended Third-Party Complaint.

## CONCLUSION

Based on the foregoing, the Court hereby GRANTS Douglas N. Anderson's Motion for

Summary Judgment [ECF No. 57], GRANTS in part and DENIES in part Louis Paula's Motion

for Summary Judgment [ECF No. 61], GRANTS in part and DENIES in part ANCO Steel

Company's Motion for Summary Judgment [ECF No. 65], and DENIES InteRebar's Motion for

Summary Judgment [ECF No. 69] as follows:

1. On the remaining Count II of ANCO Steel's Complaint, the Court GRANTS summary judgment in favor of Plaintiff ANCO Steel and against Defendant InteRebar on the breach of contract claim based on nonpayment of rent in the amount of $74,670.00 as well as ANCO Steel's other contractual remedies, in a total amount that remains to be determined.

2. On InteRebar's Amended Counterclaim and Third-Party Complaint, the Court:

   a. GRANTS summary judgment for Counterclaim Defendant ANCO Steel on Count I for breach of contract;

   b. GRANTS summary judgment for Counterclaim Defendant ANCO Steel on Count II for criminal conversion as to the magnet system and the crane;

   c. DENIES Counterclaim Defendant ANCO Steel's motion for summary judgment on Count II for criminal conversion only as to ANCO Steel's sale of the materials left by InteRebar, which claim remains pending for trial;

   d. GRANTS summary judgment for Counterclaim Defendant ANCO Steel on (1) Count III, (2) Count IV, and (3) Count V;

   e. GRANTS summary judgment for Third-Party Defendant Louis Paula on (1) Count IV, (2) Count V, (3) Count VI solely as to the breach of contract claim based on the misuse of confidential information, and (4) Count VII;

   f. DENIES Third-Party Defendant Louis Paula's motion for summary judgment on Count VI as to the breach of contract claim based on the non-

34

compete and non-solicitation covenants in Paragraphs 3.2–3.4 of the employment agreement, which remains pending for trial; and

    g.    GRANTS summary judgment for Third-Party Defendant Douglas Anderson on Count VIII.

Remaining are (1) the issue of damages on Count II of ANCO Steel's Complaint for breach of contract against InteRebar for the failure to pay rent under the Sublease for May, June, and July 2021; (2) ANCO Steel's claim for breach of contract against InteRebar in Count II of the Complaint based on property damage when InteRebar vacated the South Crane Bay; (3) InteRebar's Amended Counterclaim Count II against ANCO Steel for conversion based on the sale of scrap metal and materials left in the South Crane Bay by InteRebar; and (4) InteRebar's Amended Third-Party Complaint Count VI against Louis Paula based on the non-compete and non-solicitation provisions in Paragraphs 3.3–3.4 of the employment agreement.

This matter will be set for a telephonic scheduling conference by separate order.

SO ORDERED on September 29, 2023.

s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT